And we will go on to Case No. 5, which is Appeal 14-1119, United States v. John Smith. Good morning. Go ahead. Good morning, Mr. Mangus. Good morning, Your Honor. My name is Russell Mangus. I'm here on behalf of the defendant, Appellant John Smith. Your Honors, the actions of the Indianapolis Police and their local ATF counterparts in this case are outrageous. After John Smith testified to a federal grand jury about police corruption in Marion County and the Indianapolis Police Office, its officers engaged on a two-year campaign to send Mr. Smith to prison. The morning before he testified, he awoke to the slogan, rats die, scratched into his car. After he testified, the Indianapolis Police immediately opened up a tax investigation of Mr. Smith and his business. They ransacked his home under a warrant and paid a good friend of his to dig up evidence on him. After more than a year of investigation, they could not find a real crime to charge Mr. Smith with, so they decided to invent a fake one. To ensure his conviction, Agent Godsave designed and controlled nearly every aspect of the crime. To ensure conspiracy charges, he continually encouraged and pressured Mr. Smith to seek a partner. To ensure a lengthy sentence, Agent Godsave invented enough fake cocaine to send Mr. Smith to prison for 40 years, a virtual life sentence. If law enforcement is allowed to use its power in this way, it sends a clear message to individuals who would testify about police corruption. Now, of course, I know that you know that our circuit has rejected the doctrine of outrageous conduct as an independent basis for a new trial. I'm wondering why you believe we should recognize a right to raise this challenge under the Due Process Clause when the same arguments could be made and could be raised in an entrapment claim. In other words, don't your claims of government fabrication, solicitation, and the absence of any prior drug activity mirror the elements of inducement and lack of predisposition in an entrapment challenge? Your Honor, I would say the reason an entrapment defense is not sufficient here is that there are a subset of defendants, including Mr. Smith, that it just does not protect. And that has to do with the burden of proof. For the entrapment test, the defendant must show he's not predisposed to commit the crime and he was induced. And there's a multi-factor test to determine predisposition. Well, two of those factors are very relevant here and are the reason why there was no way, once law enforcement decided to target Mr. Smith, that he could ever plead a successful entrapment defense. The first is the court looks at the character and reputation of the witness. And so the Indianapolis police and the local counterparts in the ATF knew the minute it decided to go after Mr. Smith that it had a confidential informant who would parade a litany of unverified, uncharged, unconvicted, but unsavory acts in front of a jury and paint him into a corner. Second, and what this court says is the most significant factor in determining predisposition, is the defendant's initial reluctance to commit the crime. And here, the way the ATF strategically gathers evidence makes it nearly impossible for a defendant like Mr. Smith to prove that. There was a three-month period of time, beginning sometime in October 2010, when the ATF began employing Mr. Smith's close friend, John Roberson, to solicit him to participate and to meet with Agent God Save. But the ATF did not turn on the tape recorder, so to speak, and use a wire until December, at which point two months had passed. And so if Mr. Smith was reluctant 100% against the scheme from the beginning, for the first month, for the second month, there was no way that he was going to be able to prove that to the jury in face of a tape recorder. So one of the more recent times that this court has looked at it is the Westmoreland case. It's a year and a half old. And what the opinion says in that case is that where this defense has been recognized, you basically have to show two things. Number one, the government created a crime that didn't or a criminal enterprise that didn't exist before. Number two, that the government had to coerce the defendant to commit the crime by some unreasonable means. So let's say that we recognized it. Presumably that would be the standard. Where is the coercion to commit the crime by some unreasonable means in this case? Well, there is evidence at trial of coercion. Mr. Smith testified that the only reason he committed the crime was because his close friend, Mr. Roberson, told him that his life was in danger and he needed a favor to get him out of it. Mr. Roberson testified that he knew and the ATF knew that Mr. Smith was in financial straits because of this ongoing tax investigation that had gone over the course of a year and ruined his business. Is that coercion, though, I guess is my question. I think it's a question for the court whether it rises to the level of coercion. I would also say that the Westmoreland opinion, if you read the line in Westmoreland, I don't think it suggests that those are two necessary conditions to proving outrageous government conduct. I think it's saying outrageous government conduct has been found under fact set A and under fact set B. And, indeed, if you look at the cases cited in Westmoreland for that proposition, one of them, United States v. Twigg, is a case that didn't involve coercion. Rather, it involved the government, the DEA creating a drug crime and soliciting the participation of someone. Well, they set up a lab in that situation. That's correct. And the other point I would say there, Your Honor, is that in Westmoreland, the Seventh Circuit cited to a Ninth Circuit case for that proposition. If you look at the Ninth Circuit precedent, and the most recent, I think, is United States v. Black, that court surveys sort of the lay of the land on due process and outrageous conduct and finds that there are three independent factual situations, each of which would be more sufficient to find due process. Violation one is where the government creates a crime merely to press charges against the defendant. Two, as you brought up, is the coercion, mental or physical coercion. And three is where the government plans and controls the crime. And so I think it's fairly clear, giving a close read to the cases, that the situations that Westmoreland addressed are situations that can independently be sufficient are not both required conditions to find outrageous government conduct. I'd like to discuss the case of United States v. Russell, the Supreme Court case, where all nine justices found that, under the right set of circumstances, outrageous conduct could violate a defendant's due process. And it's holding the court held that the only practical means of intercepting many drug crimes is, and I'll quote, the infiltration of drug rings and a participation in their unlawful present practices. There are two key words there. The first is infiltration, and the second is present. Under the due process principles of that case, it doesn't violate due process to infiltrate a presently operating drug crime. In contrast, Justice Stewart wrote separately in Russell that, quote, the courts must be closed to the trial of a crime instigated by the government's own agents. Justice Douglas also wrote separately that government power is abused when it is employed to promote rather than detect crime. And there are other federal courts and other federal cases that have picked up on the Supreme Court's guidance. Most relevant here are cases like United States v. Twigg and United States v. Batres-Santolino. Both of those cases hold that it was outrageous conduct for the DEA to create a drug crime to solicit the participation of individuals who are not currently involved in drug dealing. To your point, Your Honor, about there are several decisions in the circuit that say the outrageous conduct defense doesn't exist, I give two answers there. First, the Supreme Court has expressly preserved the defendant's right to bring that defense. All nine justices in Russell signed on that under the right set of circumstances, outrageous conduct can violate due process. In a later case, United States v. Hampton, a majority of the court, five justices, signed on to the opinion that it's irrelevant and a defense that can be brought. Second, although this court certainly has language disavowing the outrageous conduct defense, it's clear, if you give a close reading to the cases, that it's not so much outright rejecting the defense as it is rejecting the facts that have been presented to it. There are cases both before and after Boyd where this court applies due process analysis to outrageous conduct. A couple of those cases that are relevant here, United States v. Belzer, this court found that when the Secret Service infiltrated an ongoing operation, it was constitutional. It cited TWIG and distinguished TWIG to do the ongoing versus creation. And even United States v. Westmoreland, distinguished TWIG is presenting a different set of facts. You're deep into your rebuttal. I'll save the remaining minute if you don't mind. Thank you. Thank you, Your Honor. Thank you. Mr. Bella, good morning still. Good morning. Good morning, Your Honor. Good morning, Your Honor. I'm Daniel Bella representing the government in this case. Defendant John Smith had full and ample opportunity to present his entrapment defense to the jury and to have the jury instructed on the defense of entrapment, and the jury didn't buy it. Now on appeal, he argues that the district court committed plain error by not anticipating and assuming that this court would overrule Boyd and 20 years of other cases which disavow the so-called outrageous government conduct defense and by not sua sponte dismissing the indictments against him. Smith does not argue that the evidence was insufficient or that there was some procedural defect in the trial. Smith argues that this previously discredited defense should apply to his case for the first time on appeal. If there was direct evidence that he was targeted by the government because of his testimony in the anti-corruption proceedings, would there be a constitutional challenge available to him, and what would that be? Is there any such evidence here? Well, there was actually very scant evidence of that part of the case, of that claim of his. There's some mention at trial that he testified in the grand jury, but there's no mention about what he testified about, about who in the Indianapolis Police Department, if anyone, was upset with him, and whether any of those officers were part of the investigation in this case. And the Indianapolis Police Department really played a marginal role in the sting operation here. It was primarily special agents with the ATF and Indianapolis police officers serving as recipients of the drugs, if you will, after the run had been completed. What he's really arguing is evidence of motive on the part of the government to entrap him. But as I say, there was very little evidence of that. His primary defense at trial was that this John Roberson was in some kind of trouble out east, and in order to save Roberson, it was necessary for Smith to engage in this conduct. But even there, it's not specified, it's not explained what kind of trouble Roberson was involved in that would cause Mr. Smith to have to commit the criminal conduct. You know, we are increasingly seeing these types of government operations in which the operation seems to be planned so as to maximize the possible prison time for the offense. Is the entrapment defense the only limit on the danger of overreaching? And is that a realistic limit if the defendants have no criminal past at all? Here we're dealing with a man with no criminal past at all, and 40 years. Forty years. That's more the product, Your Honor, of the mandatory minimums that are involved. Well, the mandatory minimum, as I recall, was 10 years. That's on the drug offense, but what really hurt him was the weapons offenses. And Smith was not only a willing, he was an eager participant in this criminal conduct, and he was the one that had scores of weapons and suggested what kinds of weapons he would bring with him to protect the drug couriers in this case. This is not a case where the government overreached and now is trying to preserve its conviction on appeal. So I want to go back to Judge Rovner's original question to you, and I understand what you're saying is that there isn't any evidence that he was targeted because he had complained about the police. Let's say there was, if there was direct evidence of that. Would he have any remedy other than entrapment? I think that entrapment would be his remedy, and I think that entrapment protects him. Because let's say that there were some Indianapolis police officers who were angry at him. In the absence of any evidence that there was overreaching inducement of somebody who was not predisposed to commit the crime, there's no connection between Indianapolis police officers angry at him for whatever happened before and the criminal conduct in this case. And if there is a connection, if those officers did something special to entrap him, to offer over-the-top inducement, well, then the entrapment defense protects him. So basically the answer is no. There's no remedy. There's no defense or no remedy other than the entrapment defense. I think entrapment is his only remedy, and I think it's an adequate remedy. So if this circuit did recognize outrageous government conduct as a defense, as a couple others at least have in a couple of cases, why isn't this outrageous in a nutshell? In this case, the evidence is replete that this defendant was ready, willing, and able to commit this crime.  He jumped at the chance. And, frankly, this started out Officer Anderson was conducting a tax investigation of the defendant and talked to Brad Shaw, who was a former employee, who could tell her the hierarchy of the defendant's business, who was employed, how much they were making, how many people were employed. And Brad Shaw put her in touch with this John Roberson. And Roberson didn't tell her about taxes. He told her that the defendant, Smith, was asking Roberson to locate stash houses that the defendant could rob. And that's when she realized this was beyond her resources and ability, and she turned over to the ATF. And the ATF had these meetings with the defendant. And each and every one of the meetings between God Save and the defendant was recorded except for one. And the defendant, at the very first meeting, said to Officer Special Agent God Save, I've had people say, hey, man, why don't you take your police car and run to Texas, and why don't you run here or run there and bring a load up one time? I'll pay you big money. And Smith goes on to say, and I'll say, why don't we? Why don't you pay me less money, and we'll make several trips. We'll make a bunch of trips. And it's only after Smith says that that Special Agent God Save talks to Smith about the idea of providing security for a drug courier run. And Special Agent God Save asks Smith if he ever thought about doing security when somebody meets to transact business. And Smith says, need people to watch your back? Absolutely, because I've got two guns on me right now. I've got assault rifles. I'm highly trained. I'm ex-Army. I think we can make some money. Get comfortable with me. We can run whatever you've got, whatever you want to do. Even though I'm suspended, if you ever need a ride, if we ever get pulled over, I'm driving. All I have to say is, hey, we're on our way. Sorry. It's all about money. We're just looking at the green. You've got my number. Just call me. And so this doesn't even come close to a case where there was outrageous government conduct. And that was the very first meeting between Smith and Special Agent God Save. Smith repeated that performance the first time he met with Officer Jeremy Ingram. In meeting with Special Agent God Save on February 8, 2011, they run into Officer Ingram posing as a colleague of Special Agent God Save. And Officer Ingram says, when God Save gets a load of drugs in, then I deliver it to his customers, and I'll make the run. And then when Special Agent God Save leaves the table, Smith proposes to Ingram. He proposes to drive a car following Ingram when he makes the drug runs, says he'll be armed, take people out if they attack Ingram, he'll have his police credentials with him, and if the police focus attention on Ingram, he'll make a move to distract the police and distract their attention to himself, and then he'll use his credentials to smooth the case over. And he'll do this for $500 a trip. And Smith asks Ingram, makes the proposition to Ingram, and then tells Ingram, don't tell God Save about this, let's keep this between you and I. So Smith was an eager participant in this sting operation. And not only that, remember that Smith told Roberson, find some stash houses for me to rob. And Smith ran a security company that provided security for apartment complexes in Indianapolis, and they were in bad areas of Indianapolis, and there was some evidence that all sorts of criminal conduct occurred in these apartment complexes. It was just a matter of time before Smith identified a drug dealer or a stash house that he could rob. So this isn't a case where the government created criminal conduct or some crime out of thin air. This is a case where Smith was already actively looking for some sort of criminal conduct to engage in, specifically robbing a stash house. And it would have happened eventually. What the government did, what the ATF did, was they set up the sting operation, made the opportunity available to Smith, and he eagerly jumped on it. When it becomes apparent that somebody is considering criminal activity, whether it's a murder for hire or blowing up a government building or, in this case, robbing a stash house, the government is entitled and, in fact, has a duty to investigate it. And that's what the government did here. And sometimes the best way to investigate it, sometimes the only way to investigate it, is to set up a sting operation and see if the person is serious about what he was claiming he wanted to do. And in this case, Smith proved he was serious. Also, I draw the court's attention to the comments of the district court at Smith's sentencing. And the trial court judge said, I'm not at all being critical of the government for having brought this case. I think it's a righteous prosecution that was necessary given the defendant's conduct and action. And what I heard on those tapes were very alarming. So this was a merited prosecution. It doesn't come anywhere close to outrageous government conduct. And I don't think there's any need to resurrect or implement a defense of outrageous government conduct. I think the entrapment defense adequately protects Smith, and there was nothing outrageous about what the government did here. Thank you. Thank you. Mr. Mangus, you have a minute, but I'll give you two. Thank you, Your Honor. I'd like to note that most of the conversations, nearly all of the conversations Mr. Bella referred to, were several months into the solicitation and encouragement of Mr. Smith, which began in October of 2010. The conversation that the government bases its entire reason, its alternate explanation for why it began to set up the sting, is this conversation between Roberson and Smith about a drug stash house. As the government acknowledged in its brief, that conversation occurred in the fall of 2010. It's important to note Smith and Roberson met in 2004 and were very good friends. I would suggest to this Court it's no coincidence that the first time a conversation about drugs occurred was when Roberson was out living his usefulness in a tax investigation, and the IMPD was desperate to find something to stick. I also think it's no coincidence that the subject matter of that conversation, robbing a drug stash house, just happens to be ripped directly from the ATF playbook. I would suggest, Your Honors, that this is part and parcel of the scheme to net Mr. Smith. It's not something that instigated the scheme. And what you say was outrageous about this was what? It was the proposition of him being targeted for having made complaints? I think there are two parts to it. One, the motivation to target him because he had testified against them, and second, the idea that they can just out of whole cloth create a crime that he had no background in, had no involvement. I mean, John Roberson was very clear in his testimony that despite the conversation, Smith had never engaged in any of that activity, had no involvement in drugs prior to meeting Agent Gladsave. With respect to the officer's motivation, it's important to note Detective Anderson, the tax investigator, testified that she was aware of Smith's grand jury testimony. And these guys from the ATF were not detached guys that flew in from Washington. They were the local task force. They worked hand-in-hand with Indianapolis police officers. I would suggest to this court that the facts of this case are much different than cases like Westmoreland, that involved an investigator having an affair with a target's wife, and much more like cases, United States v. Twigg, United States v. Batres-Santolino, where the government creates a drug crime out of whole cloth and solicits an individual who had no prior involvement in drugs. Thank you, Your Honors. Mr. Mangus, thank you so much. You were appointed, and my goodness, you've done a fine job. Happy to do it, Your Honor. Thank you very much. Thank you. You really have the thanks of the court. Thank you. And, of course, the government always has the thanks of the court. But you actually get paid. All right. Okay. Case will be taken under advisement, and thank you so much.